Filed 7/7/26  P. v. Carranza CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>SAMUEL CARRANZA,<br><br>　　　Defendant and Appellant. | F088427<br><br>(Super. Ct. No. BF198755A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Bradley King, Jr., Judge.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Samuel Carranza fired a handgun multiple times at a vehicle in which the victim was a passenger, shooting the victim in the head and damaging her brain. A jury found Carranza guilty of attempted premeditated murder, assault with a semiautomatic firearm, shooting at an occupied motor vehicle, and destruction of evidence. The jury also found true that Carranza personally and intentionally discharged a firearm causing great bodily injury, personally used a firearm, and personally inflicted great bodily injury. Carranza was sentenced to life with the possibility of parole for the attempted murder plus 25 years to life for the personal and intentional discharge of a firearm enhancement.

On appeal, Carranza contends: (1) the attempted murder conviction must be reversed because the trial court failed its mandatory duty to correct the jury's expressed confusion about the specific intent element of this offense; and (2) the court abused its discretion and violated Carranza's right to a fair trial by a jury of 12 by failing to discharge a juror who admitted he may have missed testimony while sleeping during the trial.

We order the trial court to prepare an amended abstract of judgment showing the correct conviction for shooting at an occupied motor vehicle. In all other respects, the judgment is affirmed.

## PROCEDURAL BACKGROUND

On June 13, 2024, the Kern County District Attorney filed an amended information charging Carranza with: attempted premeditated murder (Pen. Code,[1] §§ 664, 187, subd. (a), 189; count 1) of the victim, A.R.; assault with a semiautomatic firearm (§ 245, subd. (b); count 2); assault with a firearm (§ 245, subd. (a)(2); count 3); shooting at an inhabited dwelling (§ 246; count 4); discharge of a firearm with gross negligence (§ 246.3, subd. (a); count 5); and misdemeanor destruction of evidence

---

[1] Undesignated statutory references are to the Penal Code.

(§ 135; count 6). The amended information further alleged Carranza: personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d); counts 1 & 4); personally used a firearm (§ 12022.5, subd. (a); counts 1, 2, 3, & 4); and personally inflicted great bodily injury (§ 12022.7, subd. (a); counts 1, 2, 3, 4, & 5). Four aggravating circumstances were alleged on all felony counts: the crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court,[2] rule 4.421(a)(1)); a weapon was used in the commission of the crime (rule 4.421(a)(2)); Carranza engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)); and Carranza was on probation, mandatory supervision, postrelease community supervision, or parole when the crime occurred (rule 4.421(b)(4)).[3]

On July 5, 2024, the jury found Carranza guilty of attempted premeditated murder, assault with a semiautomatic firearm, shooting at an occupied motor vehicle,[4] and destruction of evidence. The jury did not reach verdicts on counts 3 and 5 as these were lesser offenses of counts 2 and 4, respectively. The jury found true the enhancements as alleged on their respective counts.

After the verdict, the trial court conducted a bench trial on the aggravating circumstances. On the prosecution's motion, the court dismissed the aggravating circumstance the offenses were committed while on probation (rule 4.421(b)(4)). The court found true for counts 1, 2, and 4 that the offenses involved great violence

---

[2]     Further rule references are to the California Rules of Court.

[3]     Trial on the aggravating circumstances was bifurcated at Carranza's request.

[4]     Though the amended information alleged Carranza violated section 246 by shooting at an inhabited dwelling, the jury instruction on count 4 alleged a violation of the same statute for shooting at an occupied motor vehicle and the verdict form reflected that allegation.

3.

(rules 4.421(a)(1)) and weapon use (4.421(a)(2)) but found not true that Carranza engaged in violent conduct that indicates a serious danger to society (rule 4.421(b)(1)).

On August 1, 2024, the trial court sentenced Carranza for count 1 to life with the possibility of parole (with a seven-year minimum parole eligibility) plus 25 years to life for personally and intentionally discharging a firearm causing great bodily injury. On count 1, the court further imposed but stayed three-year terms each for the enhancements for personal firearm use and personal infliction of great bodily injury. The court also imposed but stayed pursuant to section 654 the following: on count 2, the low term of three years plus three years for the personal firearm use and three years for personally inflicting great bodily injury; and on count 4, the low term of three years plus 25 years to life for personally and intentionally discharging a firearm causing great bodily injury, three years for the personal firearm use, and three years for personally inflicting great bodily injury. On count 6, the court imposed a term of 180 days in county jail to be served concurrently with count 1. Counts 3 and 5 were dismissed on the prosecution's motion.

Carranza filed a timely notice of appeal.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

The victim, 19-year-old A.R., was friends with A.C., Nancy F.'s daughter. On the night of February 9, 2024, A.R. and A.C. were at Nancy's house in Bakersfield. One of Nancy's other daughters told her mother that A.R. was in a social media dispute with another girl. Nancy wanted to make peace between A.R. and the girl who was at a party at a residence on Buckley Avenue.

Around 1:00 a.m., Nancy drove her gray SUV with her three daughters, A.R., and a male named Daniel to the party. Nancy parked across the street from the party. Nancy's group including A.R. came to the residence's front gate. Carranza was one of the guests at the party. He was standing near the residence's pillar when Nancy's group

approached. Carranza took a knife out of his pocket, opened the switchblade, and approached Nancy's group. Nancy's group and the partygoers exchanged words. A woman came out of the residence and went toward the front gate but was restrained by other partygoers. Nancy's group got back in the SUV and returned to Nancy's house.

Around 1:40 a.m., Nancy drove with the same group back to the party to drop off Daniel who had arranged to be picked up by a friend. Nancy parked her SUV close to where she had previously parked and turned off the SUV. A.R. was in the middle seat of the SUV's second row.

A silver compact car pulled up near the party at about 1:45 a.m. An unidentified male got out of the silver car, approached the partygoers in the residence's front yard, and handed a semiautomatic handgun to Carranza. Carranza then walked toward Nancy's SUV while firing the handgun multiple times at the SUV.

Nancy's group was still waiting in the SUV when Nancy heard loud bangs she thought were fireworks. She heard her car windows crack and realized the sound was from gunfire. Nancy believed she heard six to eight gunshots. She started up the SUV and drove back to her house.

After the shooting, Carranza gave the handgun back to the unidentified male. The male got back in the silver car and the car sped away down the street. Carranza used his phone light to search for and collect shell casings from the ground. Other partygoers helped Carranza search. Carranza and the rest of the party then returned inside the residence. Within minutes, Carranza and two other men left the residence, got into a white Lexus, and drove away.

Members of Nancy's group called the police during the drive back to Nancy's house. Kern County Sheriff's deputies responded to her house. A.R. was still in the SUV's back seat when the deputies arrived. She had been shot on the left side of her head. A.R. was unable to hear or see just after the shooting. She was conscious with a pulse but nonresponsive when the deputies tried to question her.

5.

The fire department and an ambulance arrived at Nancy's house in response to the deputies' call for medical aid. A.R. was transported by ambulance to the hospital. The bullet had entered the left side of A.R.'s skull and gone into her brain causing bleeding in the brain. Fragments of bone from A.R.'s skull and the bullet lodged in her brain. Doctors removed a portion of her skull. A.R. had trouble speaking, walking, and with her memory after the shooting and still struggled with speaking at trial.

Bakersfield Police Officer Alejandro Mendez drove his patrol vehicle toward the scene of the shooting in response to a call for service. While en route, Mendez saw a white Lexus driving fast and leaving the general area of the shooting. Mendez followed the Lexus and activated his lights and sirens. The Lexus pulled over at a gas station. Carranza was in the Lexus's front passenger seat while another person was driving, and a third person was in the rear passenger seat. Mendez did not detain Carranza or the other occupants after nothing came back from a records check and search of the car. As the Lexus was leaving, Mendez received a Kern County Sheriffs' dispatch of a possible suspect vehicle related to the shooting matching the Lexus. Mendez followed the Lexus and reinitiated the stop. Kern County Sheriff's deputies arrived and detained the Lexus's occupants for approximately three hours. Carranza and the others were released because the deputies did not feel they had enough evidence at that point to make an arrest.

Deputies searched the residence where the shooting occurred. Firearm magazines, .22-caliber ammunition, and nine-millimeter ammunition were found. The deputies seized a digital video recording (DVR) device located in the residence's garage. The DVR was connected to surveillance cameras affixed to the residence's exterior. Videos recorded by the cameras on the night of the shooting were extracted from the DVR. The videos captured the shooting and were played for the jury.

Mark Riehle, a crime scene technician with the Kern County Sheriff, examined Nancy's SUV for evidence on the night of the shooting. The SUV had three bullet strikes on the driver's side and one strike on the rear passenger's side window. The three strikes

on the driver's side were in the rear window exterior, the rear signal lens, and the rear window. Riehle recovered a lead bullet fragment from the passenger's side rear door. There was blood on the rear seat, as well as tears and holes in two of the rear passenger seatbelt straps.

On March 22, 2024, Carranza was arrested at his house. Deputies interviewed Carranza. He confirmed a photo from the residence's videos depicted him. He denied acting in self-defense and insisted he had not done anything.

## II.  Defense Evidence

Carranza testified on his own behalf. During the first confrontation with Nancy's group, Carranza pulled out a knife in case he had to defend himself against the group. During the second confrontation, the passenger of the silver car, "Chapo," arrived, handed the gun to Carranza, and told him to shoot. Carranza did not know and had never met Chapo but testified Chapo threatened to kill Carranza and his family if he did not shoot. He believed he had no choice but to shoot.

Carranza did not summon Chapo to the street and could not describe what he looked like. He picked up the shell casings after the shooting because Chapo told him to do so.

Carranza did not know A.R., Nancy, or any of the other passengers in Nancy's SUV. He denied using a firearm before the night of the shooting or owning a gun.

## DISCUSSION

## I.  Responses to Jury's Questions

Carranza argues the attempted murder conviction and associated premeditation true finding must be reversed because the trial court failed its mandatory duty to correct the jury's confusion about the specific intent element of attempted murder. He claims the central disputed issue at trial was his mental state and the jury's verdict turned entirely on their understanding of the specific intent required for attempted murder. Carranza contends the jury's notes during deliberations revealed a profound and escalating

7.

confusion on this issue, and the court failed to adequately instruct the jury by providing only minimalist, nonresponsive answers to their questions. He argues the court's answers created a path for the jury to convict Carranza on a legally invalid theory and unconstitutionally lowered the prosecution's burden of proof on the only contested element of the attempted murder charge.

## A.    Background

The jury was instructed on the elements of attempted murder with CALCRIM No. 600 as follows: "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person." The jury was instructed on the allegation of premeditation and deliberation for the attempted murder with CALCRIM No. 601 and the charge of destruction of evidence with CALCRIM No. 460A.

The jury was further instructed on the union of act and intent with CALCRIM No. 252. The CALCRIM No. 252 instruction given to the jury stated in relevant part: "The specific intent required for the crime of attempted murder is the specific intent to unlawfully kill a human being. [¶] The specific intent required for the crime of destruction of evidence is the specific intent to prevent a physical object or substance from being produced at a trial, inquiry, or investigation. [¶] The specific mental state required for the crime of destruction of evidence is knowledge that a physical object or substance was about to be produced in evidence at a trial, inquiry, or investigation. [¶] The specific mental state required for the crime of willful, deliberate, and premeditated attempted murder is that when the attempted murder was committed, it was done willfully, and with deliberation and premeditation."

During deliberations, the jury submitted three notes with questions for the trial court. The first note stated: "[i]n regards to [c]harge 1, [a]ttempted [m]urder. It says to prove the defendant is guilty, we must prove that, 'The defendant intended to kill <u>that</u>

8.

person.'  We are under the impression the defendant had the intention to kill someone, but not really specifically [A.R.].  We're having trouble reaching a verdict due to the specifics of, 'that person.'  If he had the intention to kill anyone in the car, does that imply he had the specific intention to kill [A.R.]?"

The trial court discussed the jury's note with counsel.  Relying on case law, the court intended to answer as follows:  "The mental state requirement for attempted murder is the inten[t] to kill a human being, not a particular human being."  Defense counsel objected to this proposed answer arguing the court's cited case law was inapplicable as it was based on a "kill zone" theory which was not the People's case against Carranza.[5]  Counsel suggested the court instead refer the jury to CALCRIM No. 600.  The prosecutor believed the court's proposed response was on point to address the jury's question.  The court responded to defense counsel's argument by clarifying the relied upon case law discusses mental state as it relates to intent to kill and the kill zone theory as two separate issues.  The court then gave the jury its proposed response.

The jury submitted a second note to the trial court:  "1. What's the legal definition of 'intent'?  2. It's hard to determine if Carranza was thinking 'I want to kill someone' and had the intention to do so.  We are under the impression he had the intent to harm, but it's hard to distinguish if he had the intent to kill.  Is shooting at a vehicle an intent to kill?"

---

[5]  "The kill zone theory is one of concurrent intent—the defendant has the intent to kill a particular target, and the jury can infer from the method employed to attempt killing the primary target a concurrent intent to kill those around the primary target to ensure the primary target's death."  (*People v. Medina* (2019) 33 Cal.App.5th 146, 154–155; *People v. Bland* (2002) 28 Cal.4th 313, 329–330.)  A kill zone instruction should be given "only in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm."  (*People v. Canizales* (2019) 7 Cal.5th 591, 608.)  Here, the jury was not given a kill zone instruction.

The trial court conferred with counsel about the jury's second note. The court proposed to respond: "1. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings. 2. Whether the defendant had the intent to kill is for you to decide." The court explained these answers were consistent with CALCRIM No. 200. Defense counsel objected to both answers and suggested the answers "just refer to jury instruction period." Counsel acknowledged though and the court confirmed the response copied the exact words from CALCRIM No. 200. Counsel then asked the court to add at the end of the first answer that the sentence was copied from CALCRIM No. 200 but otherwise not to repeat that the jury is the trier of fact. The prosecutor had no objection to the court's tentative response. The court gave the response to the jury over defense counsel's objection.

The jury's third note asked about the following language of CALCRIM No. 252: " 'For you to find a person guilty of these crimes or to find the allegations true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent, a specific mental state or both.' " The jury queried: "If we find the defendant had a specific mental state, but are unsure of an intent, can we still find the defendant guilty?"

The trial court proposed to respond to the third note as follows: "1. The crime of attempted murder in violation of Penal Code Section 664/187(a), as charged in Count 1 requires a specific intent. The specific intent required is explained [in CALCRIM No. 600] of your jury instructions. [¶] 2. Special Allegation [No.] 1 in Count 1, deliberation and premeditation in violation of Penal Code Section 189 as alleged in Count 1, requires a specific mental state. The specific mental state required is explained [in CALCRIM No. 601] of your jury instruction packet. [¶] 3. The crime of destruction of evidence in violation of Penal Code Section 135 as charged in Count 6 requires a specific intent *and* a specific mental state. The specific intent and specific mental state required are explained [in CALCRIM No. 460A] of your jury instruction packet. [¶]

10.

4. All other crimes and allegations charged in this case require general criminal intent. General criminal intent is explained in the fourth paragraph of [CALCRIM No. 252] of your jury instruction packet." Defense counsel objected to the court's proposed answers arguing that "[t]he answer is clearly no." Alternatively, counsel suggested the court just refer the jury back to the instructions. The court overruled counsel's objection. The court expressed concern about the jury conflating the issues of specific intent and specific mental state. The court opined "that would be an injustice to [Carranza] if, for example, they found that he does not have a specific intent but he does have a specific mental state and found [Carranza] guilty of a crime that requires a specific intent based on a mental state as opposed to an intent." The court gave the jury its response over defense counsel's objection. After the court finished giving its response, Juror No. 6 raised her hand and defense counsel asked that she be permitted to speak. The court instead advised the jury that they may submit another note if there were any additional questions, comments, or concerns, and ordered the jury back to the deliberation room.

The jury returned to their deliberations and reached their verdict without additional questions.

## B. General Legal Principles

"Every crime requires a union of an act and a criminal mental state." (*People v. Morales* (2001) 25 Cal.4th 34, 45; § 20.) "The mental state, or mens rea, that must accompany each crime is an element of the offense," and must be proven by the prosecution beyond a reasonable doubt. (*People v. Mumin* (2023) 15 Cal.5th 176, 190; *People v. Cuevas* (1995) 12 Cal.4th 252, 260 [the prosecution has the burden of proving every element of a crime beyond a reasonable doubt].)

A trial court has a duty to instruct the jury on the general principles of law necessary to the jury's understanding of the case. (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.) "That duty requires the trial court to instruct on all the elements of the charged offenses and enhancements." (*People v. Williams* (2009) 170 Cal.App.4th 587,

11.

638–639.) "A jury misinstruction that relieves the prosecution of its burden to prove an element of a crime—by either misdescribing the element or omitting it entirely—violates" the requirement that the jury determine the defendant's guilt on every element of the crime with which he or she is charged beyond a reasonable doubt. (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.)

A trial "court also has 'a general obligation to "clear up any instructional confusion expressed by the jury." ' [Citation.] This obligation arises under section 1138, which provides that if deliberating jurors 'desire to be informed on any point of law arising in the case, … the information required must be given' to them in court." (*People v. Doane* (2021) 66 Cal.App.5th 965, 980.)[6] During jury deliberations, "[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law. [Citation.] If, however, ' "the original instructions are themselves full and complete, the court has discretion under … section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 985.) "Although 'comments diverging from the standard [instructions] are often risky' [citation], it is generally not acceptable for a trial court to 'merely repeat for a jury the text of an instruction it has already indicated it doesn't understand.' [Citation.] Rather the court 'must at least *consider* how it can best aid the jury.' " (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887; *People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

We review for abuse of discretion a trial court's decision to provide further instructions in response to a jury's inquiry. (*People v. Franklin, supra,* 21 Cal.App.5th at

---

**6**     Section 1138 provides: "After the jury have retired for deliberation, … if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

p. 887, fn. 4; *People v. Doane, supra*, 66 Cal.App.5th at p. 980; *People v. Waidla* (2000) 22 Cal.4th 690, 745–746.) "[W]e review de novo the legal accuracy of any supplemental instructions provided." (*Franklin*, at p. 887, fn. omitted; see *People v. Mitchell* (2019) 7 Cal.5th 561, 579 [whether an instruction correctly states the law is reviewed de novo].)

### C. Attempted Premeditated Murder

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "Attempted murder requires express malice, i.e., intent to kill. Implied malice—a conscious disregard for life—suffices for murder but not attempted murder." (*People v. Stone* (2009) 46 Cal.4th 131, 139–140.) Express malice, or intent to kill, is shown when the defendant " 'either desires the victim's death, or knows to a substantial certainty that the victim's death will occur.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.)

Unlike murder, "attempted murder is not divided into degrees, but the sentence can be enhanced if the attempt to kill was committed with premeditation and deliberation." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654; § 664, subd. (a).) More than intent to kill is required to support a finding of deliberation and premeditation. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*Ibid.*)

### D. Analysis

Carranza contends the jury's second note revealed its confusion between the mental states for assault and attempted murder. He interprets the jury's second note asking if shooting at a vehicle is "intent to kill" as a request for clarification on the line between implied and express malice. Carranza claims the difference between the two types of malice is a term of art and the trial court erred by responding that undefined words have their "ordinary, everyday meanings," and intent was for the jury to decide.

13.

He argues the court's error allowed the jury to proceed on a legally invalid theory that intent to harm was sufficient for a conviction.

While the court has "a duty to define terms that have a technical meaning peculiar to the law," the "court has no sua sponte duty to define terms that are commonly understood by those familiar with the English language." (*People v. Bland*, *supra*, 28 Cal.4th at p. 334.) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*People v. Estrada* (1995) 11 Cal.4th 568, 574.)

We disagree with Carranza's interpretation of the jury's second note. The note never mentioned "malice." Instead, the jury asked for "the legal definition of 'intent,' " and questioned if shooting at a vehicle shows an "intent to kill." "Malice" and "specific intent" are terms of art with technical, legal meanings.[7] But we are unaware of, and Carranza fails to point to, any authority that "intent to kill" in the context of attempted murder has a technical, legal meaning that differs from the common usage of those words. Carranza's trial counsel did not offer a definition of "intent to kill" to the trial court and presumably agreed the words should be interpreted by their ordinary meaning because he requested the court simply refer the jury to the same instruction the court proposed to quote verbatim (CALCRIM No. 200). The court correctly told the jury that words not specifically defined in their instructions are to be applied using their ordinary, everyday meanings.

Carranza contends the trial court should have given this answer to the jury's second note: " 'The specific intent to kill required for attempted murder means the intent to cause death. An intent merely to harm or injure, even if committed by a dangerous act such as shooting at a vehicle, is not sufficient for a conviction of attempted murder.' "

---

[7]      See *People v. Irwin* (1984) 155 Cal.App.3d 891, 899 [malice is a term of art]; *People v. Wright* (2025) 113 Cal.App.5th 832, 841 [" 'specific intent'… is a term of art, but it is bad art"].)

14.

This proposed answer is incomplete and legally incorrect because, as stated above, intent to kill may be shown when the defendant either desires the victim's death *or* knows to a substantial certainty that the victim's death will occur. (*People v. Houston*, *supra*, 54 Cal.4th at p. 1217.)

The jury's question about whether Carranza acted with intent to kill or intent to harm does indicate indecision on if he was guilty of attempted murder or assault. Unlike attempted murder, assault does not require an intent to kill because assault does not even require a specific intent to injure the victim. (*People v. Williams* (2001) 26 Cal.4th 779, 788; § 240.) The jury's note suggests uncertainty as to whether Carranza's shooting at a vehicle suffices to show intent to kill, i.e., if he had the specific intent required for attempted murder.

Direct evidence of specific intent may be shown by an "admission, [a] confession, [or the defendant's] testimony." (*People v. Woods* (1991) 226 Cal.App.3d 1037, 1052.) Unsurprisingly, "[t]here is rarely direct evidence of a defendant's intent." (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) As a result, "intent … must [usually] be proven circumstantially." (*People v. Thomas* (2011) 52 Cal.4th 336, 355; § 29.2, subd. (a) [intent is manifested by the circumstances connected with the offense].) "Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question." (CALCRIM No. 223.) Because "[o]ne who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots," the intent to kill "must be derived from all the circumstances of the attempt, including the putative killer's actions and words." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945–946.) "Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact." (*Id*. at p. 946.)

The trial court correctly advised the jury whether Carranza acted with an intent to kill was uniquely within their purview to determine. The court could not answer

otherwise without usurping the jury's factfinding role. As previously stated, where the original instructions are full and complete, the court has discretion to determine what additional instructions are sufficient to satisfy the jury's request for information. The jury had been instructed they "must decide what the facts are." (CALCRIM No. 200.) The instructions also sufficiently apprised the jury of how to determine if shooting at a vehicle suffices to show an intent to kill. CALCRIM No. 600 supplied an explanation of what a direct step toward killing another person may entail. Direct and circumstantial evidence were defined for the jury in their instructions (CALCRIM No. 223), and they were instructed they could rely on circumstantial evidence to find Carranza guilty (CALCRIM No. 224). The court did not abuse its discretion by giving no additional instructions beyond reiterating that whether Carranza had the intent to kill was for the jury to decide.

In the final note, the jury asked if they could find Carranza guilty if they find he "had a specific mental state, but are unsure of an intent." Carranza contends the "only correct answer was 'clearly no' " as his trial counsel argued before the trial court. Carranza presumes the jury's question was directed at the attempted murder charge as evidenced by the answer he argues the court should have given: " 'No. You may not find the defendant guilty of attempted murder unless you unanimously find he acted with the specific intent to kill. A finding on the "specific mental state" required for a separate allegation, such as premeditation, cannot substitute for the specific intent to kill.' "

Though the jury may have still been struggling with determining Carranza's intent on attempted murder, their third note did not specify which offense or allegation this question was directed at. There is no indication the jury's question was limited to the attempted murder charge. Except the general intent offenses and allegations, the charged offenses and allegations against Carranza required showing he had a specific intent, a specific mental state, or both. As the trial court told the jury in its response: attempted murder requires specific intent, the premeditation allegation requires a specific mental

16.

state, and destruction of evidence requires both a specific mental state and a specific intent.[8] A simple "no" in response to the jury's question without knowing the specific offense or allegation at issue could therefore be incorrect. The court's response accurately explained to the jury the requisite findings for each offense and allegation and directed the jury to the relevant instructions with the requisite mens rea for each.

We reject Carranza's claim that the trial court's response was inadequate because Juror No. 6 raised her hand after the court's response to the third note. Rather than give an off-the-cuff answer to Juror No. 6, the court advised the jury to return to their deliberations and submit another note if they had additional questions. This course of action permitted the court to confer with the attorneys again before responding to more questions if the jury needed further clarification.

We likewise reject Carranza's contention the verdict followed with no indication the confusion had been resolved. The record shows this jury was unafraid to seek the trial court's guidance when needed as they had already submitted three notes during deliberations. "This particular jury demonstrated that it was not too shy to ask questions, suggesting that it would have asked another if it felt the judge's response unsatisfactory." (*Weeks v. Angelone* (2000) 528 U.S. 225, 235–236.) There was no error or abuse of discretion by the court in its responses to the jury's questions.

## II. Failure to Discharge Juror No. 7

Carranza argues the trial court abused its discretion and violated his right to a fair trial by a jury of 12 by failing to discharge Juror No. 7 after he admitted missing testimony while sleeping during the trial. He contends this error requires reversal of the

---

[8] Destruction of evidence requires showing "[a] person who, knowing that any book, paper, record, instrument in writing, digital image, video recording owned by another, or other matter or thing, is about to be produced in evidence upon a trial, inquiry, or investigation, authorized by law, willfully destroys, erases, or conceals the same, with the intent to prevent it or its content from being produced." (§ 135.)

judgment in its entirety.

## A.   Background

During presentation of the People's case, the prosecutor advised the trial court that Juror No. 7 was falling asleep and "appeared to be missing substantial portions" of the crime scene technician's testimony. The prosecutor asked the court to conduct an inquiry. The court reported also seeing this juror falling asleep. Defense counsel opined that whoever puts the juror to sleep must also make sure he is awakened. The court promised to conduct further inquiry the next day.

The next day, the trial court reiterated its intent to conduct an inquiry of Juror No. 7. The court clarified it had not personally noticed Juror No. 7 showing signs of exhaustion the previous day, but court staff had noticed and reported their observations to the court. The prosecutor had no objection to the court conducting an inquiry of Juror No. 7. Defense counsel objected and argued it was not the court's duty to intervene, but counsel's duty to keep him awake. The court overruled counsel's objection and opined it has an affirmative obligation to investigate if a juror may be sleeping during trial.

The trial court questioned Juror No. 7 outside the presence of the other jurors. Juror No. 7 admitted he had been "fighting it off" when he appeared to be sleeping during the prior day's proceedings. He conceded he "may have missed some of" the testimony but claimed to "remember some key points of evidence that were brought forward." Juror No. 7 thought he had just nodded off for a second or two and then immediately woke up. He had a rough night of sleep but felt more awake that day. Juror No. 7 promised to notify the bailiff if he felt sleepy again and needed to get up.

The trial court discussed the issue of remedy with the attorneys. The prosecutor did not want Juror No. 7 dismissed but requested Juror No. 7 notify the bailiff if he feels tired and a comfort break could be given. The court agreed to this request. Defense counsel requested Juror No. 7 be dismissed and another juror be seated. The court was satisfied that Juror No. 7 was awake and lucid during the testimony of the prosecution's

witness and declined to find he had missed so much testimony to warrant his excusal. The court promised to revisit the issue at a later time if further issues arise with Juror No. 7. Defense counsel reiterated his request that Juror No. 7 be dismissed based on his reported rough night of sleep and the potential contribution to his tiredness from the courtroom's warmth as it was summer in Bakersfield. The court denied this request.

The prosecution then proceeded with presenting their case. At the beginning of the afternoon session, defense counsel advised the trial court he noticed Juror No. 7 had fallen asleep during the morning session. Counsel argued Juror No. 7 "cannot stay up" and asked again that he be excused. The prosecutor had not seen Juror No. 7 dozing off and reported seeing him appearing to listen attentively to the evidence. The court had not seen Juror No. 7 sleeping but saw him itching his eyes several times and staring forward. Defense counsel clarified he did not see Juror No. 7 "necessarily sleeping" but noticed him dozing off at least four times.

The trial court conducted further inquiry of Juror No. 7. Juror No. 7 reported he had "been good this morning" and, although there were some points where he was "trying hard not to fall asleep," he had not "completely knocked out yet." He claimed he "definitely" was not tired anymore. Juror No. 7 confirmed he had heard all the evidence from the morning session. The prosecutor asked Juror No. 7 to notify the court if he felt like he was going to nod off and needed to move around. Juror No. 7 promised to do so.

The trial court asked defense counsel if there was a remedy he was seeking. Defense counsel again requested Juror No. 7 be excused, noting that while he did not fully doze off, he was "fixing to sleep." The prosecutor did not think Juror No. 7 needed to be excused but reiterated the previous request that the court make accommodations if requested by Juror No. 7. Defense counsel noted this was the same thing Juror No. 7 had said in the morning and questioned how many chances he would be given. The court denied defense counsel's request to excuse Juror No. 7 based on his indication he did not miss any testimony during the morning session.

19.

**B.     Applicable Law**

A trial court may discharge a juror upon a showing of "good cause" that the juror "is found to be unable to perform his or her duty." (§ 1089.) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821.) "The duty to conduct an investigation when the court possesses information that might constitute good cause to remove a juror rests with the trial court whether or not the defense requests an inquiry, and indeed exists even if the defendant objects to such an inquiry." (*People v. Cowan* (2010) 50 Cal.4th 401, 506.) "The nature of the court's inquiry may consist of a full hearing or informal questioning of the juror in the presence of counsel." (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1170.)

"While a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with great care." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted.) Before a court may discharge a juror, the juror's inability to perform his or her duties must " 'appear in the record as a demonstrable reality.' " (*People v. Johnson* (1993) 6 Cal.4th 1, 21.)

"The trial court has the authority to discharge jurors for good cause, including sleeping during trial. [Citation.] When the trial court receives notice that such cause may exist, it has an affirmative obligation to investigate. [Citations.] Both the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court." (*People v. Bonilla* (2007) 41 Cal.4th 313, 350.) A juror may not be discharged for sleeping unless there is " 'convincing proof' " the juror was " 'actually asleep during material portions of the trial.' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1349, quoting *Hassan v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411; *People v. Bowers* (2001) 87 Cal.App.4th 722, 731.)

20.

"In determining whether [juror] misconduct occurred, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.' " (*People v. Majors* (1998) 18 Cal.4th 385, 417.)

## C.    Analysis

Carranza argues the record established good cause to discharge Juror No. 7 because there was convincing proof he actually slept and missed evidence. He contends the trial court conducted an inadequate inquiry into Juror No. 7's ability to perform. We disagree.

*People v. Bradford*, *supra*, 15 Cal.4th 1229 is instructive. In *Bradford*, the trial court observed during defense counsel's cross-examination of a police detective that a juror was asleep. Defense counsel reported that " 'juror was asleep all day yesterday, also.' " The trial court responded, " 'I know,' " but did not conduct any inquiry of the juror. (*Id*. at pp. 1347–1348.) On appeal, our Supreme Court observed " 'that the mere suggestion of juror "inattention" does not require a formal hearing disrupting the trial of a case.' " (*Id*. at p. 1348.) The court further "observed that 'although implicitly recognizing that juror inattentiveness may constitute misconduct, courts have exhibited an understandable reluctance to overturn jury verdicts on the ground of inattentiveness during trial. In fact, not a single case has been brought to our attention which granted a new trial on that ground. Many of the reported cases involve contradicted allegations that one or more jurors slept through part of a trial. Perhaps recognizing the soporific effect of many trials when viewed from a layman's perspective, these cases uniformly decline to order a new trial in the absence of convincing proof that the jurors were actually asleep during material portions of the trial.' " (*Id*. at p. 1349.) In *Bradford*, "the absence of any reference in the record to the juror's inattentiveness over a more substantial period indicates that the trial court did not abuse its discretion in failing to conduct an inquiry." (*Ibid*.)

Here, the trial court did conduct an inquiry of Juror No. 7. Though the court did not personally observe Juror No. 7 asleep, the court credited the prosecution's report as well as court staff's observations that he appeared to be sleeping during the crime scene technician's testimony. During the court's initial inquiry, the court asked Juror No. 7 if he was asleep the day before, whether he missed any testimony, and his level of exhaustion. Juror No. 7 admitted he may have missed testimony but claimed to remember key points of evidence brought forward. He confirmed he was just nodding off for a second or two but then immediately woke up. This was not convincing proof that Juror No. 7 was actually asleep during material portions of the trial. Nor does the record support Carranza's assertion the court recast or minimized Juror No. 7's admission that he may have missed testimony. Rather, the court's questioning sought to investigate if Juror No. 7 was truly asleep given his equivocal report on whether he missed any testimony.[9] The court was satisfied based on its inquiry that Juror No. 7 did not miss a substantial period of the trial and the record supports that finding.

The trial court was obliged to conduct further inquiry based upon defense counsel's observations the next day that Juror No. 7 had purportedly dozed off four times during the morning session. Juror No. 7 conceded he had been trying hard not to fall asleep but denied becoming "knocked out" and confirmed he had heard all the evidence.

---

[9] Below is the relevant part of the exchange between the trial court and Juror No. 7:

"THE COURT: … Did you miss any of the testimony[?]

"JUROR [No. 7]: I may have missed some of it. But I do remember some key points of evidence that were brought forward.

"THE COURT: All right. If you could just explain to me your level of exhaustion. Sometimes people nod off for a second or two and immediately wake up. Do you think that that was the situation that you were in, or do you think that you missed more than just—

"JUROR [No. 7]: I think that was the situation I was in, your Honor."

Once the court satisfied itself that Juror No. 7 was alert, nothing more was required. (*People v. Ochoa* (1998) 19 Cal.4th 353, 418.) Defense counsel's mere speculation Juror No. 7 "*might* have been sleeping" is insufficient to discharge a juror. (*People v. Espinoza*, *supra*, 3 Cal.4th at p. 821.) This speculation was countered by Juror No. 7's representations that he had not fallen asleep or missed any evidence.

Carranza's contention that the trial court's reliance on Juror No. 7's self-assessment was insufficient is unpersuasive. The court was in the best position to observe Juror No. 7's demeanor during its inquiries into his attentiveness. We "defer to the trial court's credibility assessments 'based, as they are, on firsthand observations unavailable to us on appeal.' " (*People v. Williams* (2015) 61 Cal.4th 1244, 1262.) The court conducted an adequate inquiry into Juror No. 7's attentiveness and did not abuse its discretion by declining to discharge this juror for misconduct.

## III.    Abstract of Judgment

The People contend, and Carranza agrees, the abstract of judgment should be corrected to reflect Carranza's conviction for shooting at an occupied motor vehicle on count 4. We agree.

We may correct clerical errors in the abstract of judgment at any time " 'on [our] own motion or upon the application of the parties.' " (*People v. Mitchell* (2001) 26 Cal.4th 181, 186–187.) Although the jury convicted Carranza of shooting at an occupied motor vehicle for count 4, the determinate abstract of judgment incorrectly states he was convicted of shooting at a dwelling on this count. The trial court must modify the abstract of judgment to correctly reflect Carranza's conviction on count 4 for shooting at an occupied motor vehicle.

## DISPOSITION

The trial court is ordered to modify the abstract of judgment to reflect that Carranza was convicted of shooting at an occupied motor vehicle (§ 246) on count 4. The court is directed to forward a copy of the modified abstract of judgment to the

Department of Corrections and Rehabilitation.  The judgment is affirmed in all other respects.


                                                                              HARRELL, J.

WE CONCUR:


DETJEN, Acting P. J.


FRANSON, J.